CATHERINE B. MARTINDALE, APPELLANT, v. D. W. GALLADAY ET AL., APPELLEES.

FILED DECEMBER 23, 1915. No. 18249.

1. **Evidence:** PROBATIVE EFFECT. Physical facts that are so palpable as to amount substantially to demonstration may entirely overcome the testimony of several interested witnesses, especially if they are testifying long after the circumstances to which their testimony relates, and the circumstances, and their manner of testifying, are such as to indicate that they are testifying, not from actual knowledge and recollection of the facts, but from a strong belief and desire to establish such facts.

Martindale v. Galladay.

2. **Bills and Notes:** INDORSEMENT: EVIDENCE. In this case the plaintiff purchased the notes in suit in good faith and paid full value, and the evidence furnished by the physical condition of the notes in suit, together with plantiff's evidence and the circumstances proved, overcome the testimony of defendants that the indorsement of transfer of the notes, rendering them negotiable, was not upon the notes when the plaintiff purchased them.

APPEAL from the district court for Boyd county: R. R. DICKSON, JUDGE. *Reversed.*

*W. T. Wills* and *DeBord, Fradenburg & Van Orsdel,* for appellant.

*John A. Davies* and *M. F. Harrington, contra.*

SEDGWICK, J.

The plaintiff brought this action in the district court for Boyd county upon three promissory notes. The defendants answered, alleging that the notes were obtained by fraud. The plaintiff replied "that the plaintiff is an innocent purchaser and holder of said notes; that she purchased the said notes of Champlin Brothers, the payees of said notes, on Jan. 13, 1904, and on said date paid full value therefor to said Champlin Brothers, to wit, the full amount of principal and interest accrued to said date upon said notes; that she purchased the same in good faith in the regular course of business before the maturity of said notes, without notice or knowledge of any defense thereto or of any equities between the makers or any of them and the payees of said notes, and without notice or knowledge that any claim was made by any one that any such defense or equities existed." The court submitted to the jury the question of fraud in the notes, and also gave the jury the following instructions:

(4) "If you find that the plaintiff has established, by a preponderance of the evidence, that at the time she purchased, paid for, and received the notes in suit from Champlin Brothers, that the indorsement now appearing on said notes, 'Pay to the order of Catherine B. Martindale without recourse on us, Champlin Brothers,' was upon

each of the notes in suit, you will find for the plaintiff for the sum of $2,390."

(5) "If you find from the evidence that the indorsements now appearing on each of the notes, 'Pay to the order of Catherine B. Martindale without recourse on us, Champlin Brothers', was not upon the notes when the plaintiff purchased, paid for, and received them, the defendants can interpose any defense against said notes they had against Champlin Brothers."

There was a verdict and judgment for the defendants, and the plaintiff has appealed.

The plaintiff contends that the court should have instructed the jury to find for the plaintiff because the evidence establishes that at the time the plaintiff purchased the notes the indorsement stated in instruction No. 4 was entered upon the notes and duly signed by Champlin Brothers. The plaintiff also contends that instruction No. 5 is erroneous because, if the indorsement mentioned therein was placed upon the notes any time before the maturity thereof, the plaintiff was an innocent purchaser; that the notes were fraudulent and subject to defense in the hands of Champlin Brothers, the real payees, is conceded for the purposes of this appeal.

The plaintiff personally had nothing to do with the transaction of the purchase of these notes. Doctor Martindale, her husband, transacted the business for her, and he in turn relied upon their attorney, Mr. Skinner, a practicing lawyer at Clinton, Iowa. The plaintiff took the evidence of herself and her husband and Mr. Skinner by deposition. It did not appear whether the plaintiff herself saw the notes at the time or soon after their purchase. She was not asked whether the indorsement and transfer of the notes signed by Champlin Brothers was on the notes at the time of the purchase, neither was her husband asked that question. Mr. Skinner, who transacted the business for them, testified positively that he wrote the indorsements upon the three several notes respectively, and that they were signed by Champlin Brothers at the time they

were purchased. The notes were executed by each of nine defendants on the 30th day of October, 1903. The notes became due July 1, 1905, 1906, and 1907, respectively. Five of these defendants testified that they saw these notes at the bank in Naper in July, 1905, and that at that time the indorsement of transfer signed by Champlin Brothers was not upon the notes. It is conceded that, if the notes were indorsed when purchased by the plaintiff so as to then be negotiable, the plaintiff is an innocent purchaser, and as such is entitled to recover upon the notes. If the indorsement of transfer was not upon the notes in July, 1905, it cannot be determined from this evidence when it was made, and it might in such case be found that the plaintiff is not an innocent purchaser of the notes.

The question thus presented is of the highest importance and frequently presents difficulties of solution. If our laws do not protect commercial paper negotiated in the regular course of business, our financial transactions will be embarrassed to the great injury of those enterprises which depend upon their credit in the business world. On the other hand, to permit fraudulent practices to succeed by pretended transfers to confederates in fraud is at least equally as injurious to legitimate business. To guard against these evils, the law has provided regulations and means to assist in determining the good faith of the holders of commercial paper which in other business relations might appear quite technical. There were many signers of the notes, and the paper on which they appear is of unusual dimensions both in length and width. As they now appear, they have been folded lengthwise so as to inclose the face of the notes respectively. Payments were made thereon by some of the makers, each apparently acting for himself in making such payment. Three several payments were made on each of the notes, and indorsed as of the date of the execution of the notes. These indorsements are written at full length entirely across the back of each note, as close to the end of the note as conveniently practicable, evidently before the notes had been folded. Then

follows the indorsement of transfer: "Pay to the or-
der of Catherine B. Martindale without recourse on us.
Champlin Brothers." This indorsement is written en-
tirely across the notes, as it would naturally have been
written if the notes were not folded. The signature of
"Champlin Brothers," is immediately below the indorse-
ment, and entirely to the right of the fold in the paper.
This indorsement of transfer is written in the same bold
hand and occupies a considerable space on each of the
notes. Below these indorsements are impressions of rubber
stamps which occupy substantially all of the remaining
space to the right of the fold in the note. On July 1, 1905,
the day the first note became due, five different signers
made payments on that note, each payment being $86.51.
These payments are indorsed on the left of the fold, and
immediately under, and as close as practicable to the in-
dorsement of the transfer, and to each other. Under each
of these indorsements an ink line is drawn. Three of
these lines extend beyond the indorsements, and somewhat
beyond the fold in the note. If this indorsement of transfer
was not placed on this note after the indorsements of the
payments of July, 1905, as testified by defendants, it was
placed thereon at the time of the purchase of the note, as
testified by plaintiff's witness. There is no other evidence
fixing the time. The evidence that it is in the handwriting
of plaintiff's agent who purchased the notes for her is un-
contradicted. If it was not upon the note when the in-
dorsements of July, 1905, were made, why was a blank
space of two and one-half or three inches left between those
indorsements and the prior indorsement of October, 1903,
and the later indorsements crowded as closely together as
possible to economize room? No explanation is attempted.
The evidence that the indorsement of transfer was made
before the indorsements of payment which follow it in
form upon the notes, which is most discussed in the briefs,
is derived from the appearance of the notes themselves.
The transfer indorsement is written across the entire back
of the notes, and upon each note two words of this in-

dorsement are across the fold in the note. The appearance of these lines over the fold is such that it may be said to be impossible that they were written after the fold had broken the fiber of the paper. The lines drawn between the indorsements of July, 1905, which extend somewhat over the fold, are blurred at the fold, so much so as to furnish strong proof that when those lines were drawn the fiber of the paper had been so broken by the fold as to absorb the ink along the fold of the paper, and that the paper had become much more broken by the fold than it was when the transfer indorsement was made. If the effect of this fold upon these lines was so palpable as to amount to a demonstration of that fact, it would of itself be decisive of this appeal.

"A document or a part of a document is sometimes proved to be fraudulent if it can be conclusively shown that a part of the writing preceded and a part followed the folding of the paper. An ink line crossing a fold has certain definite characteristics, but such a line may not be more than one one-hundredth of an inch in width, and the unaided eye may not be able to see the physical evidence of the fact which under the microscope is so plain that it cannot be denied. A tiny portion of the ink in such case may actually have gone through the paper to the opposite side, and under the microscope this fact is unmistakable." Osborn, Questioned Documents, p. 73.

The appearance of these lines under a magnifying glass, together with the relative location and form of all of the indorsements on the notes, establish that the indorsements of payment of July, 1905, were made after the transfer indorsement, and entirely overcome the evidence of defendants upon that point. The fact being established that the indorsement of transfer was before July, 1905, it must have been at the time of the purchase of the notes. Plaintiff's evidence to that effect is not contradicted, except by the attempt to prove that it was not on the notes in July, 1905.

As before stated, each one of five of these defendants testified that he saw these notes in July, 1905, and that at that time the indorsements of transfer were not upon the notes. In determining the force of this testimony, we may consider the interest of these parties in the result of the litigation; that six years had elapsed since they made these payments; the circumstances under which they saw the notes at that time, and other circumstances connected with their testimony. It appears from their evidence that they had not seen the notes from the time they were signed in October, 1903, until they made these payments on the first of July, 1905; that when they made these payments the president of the bank, who was not called as a witness, showed them the notes through the window over the counter in the bank. On the evening before they testified, they were at the office of their attorney and were shown the notes by him, and apparently agreed that this transfer indorsement was not upon the notes when they made these payments in July, 1905. When they were called to the stand to testify, they were not asked to state the condition of the notes at the time they refer to, but each of them was asked a somewhat leading question in substantially the following form: "Q. I call your attention to the note marked Exhibit '5'. When you saw that note in July, 1905, at the bank of Naper, you may state whether there was written on that note at that time these words: 'Jan. 13, 1904, pay to the order of Catherine B. Martindale without recourse on us. Champlin Brothers.' A. No, sir. Q. Was the name of Champlin Brothers there? A. No, sir." One of these witnesses was asked upon cross-examination: "Q. Mr. Briggs, at the time you saw these notes in July, 1905, you knew that they were then in Martindale's possession, did you not? A. No, sir. Q. Hadn't you ever heard of Martindale up to that time? A. I don't think so. * * * Q. Didn't you hear that Martindale had these notes? A. Not to my recollection. Q. When did you first learn that the Martindales were connected with these

notes? A. I couldn't say the year. Q. What is your best impression as to the time? A. . I think it was some time when the second note became due. Q. But up to July, 1905, when the first note became due, you had never heard anything about the Martindales in connection with these notes, or otherwise? A. Not to my recollection." He was then shown a letter which he wrote to Mr. Martindale December 15, 1904, while Mr. Martindale was considering the advisability of purchasing the notes, in which letter the witness acknowledged the receipt of a letter from Mr. Martindale dated December 13, 1904, and in which the witness wrote Mr. Martindale: "We are of the opinion that your note was given payable on July 1, 1905, and that there was no interest due until that time, now you have a good note and it will be paid as soon as the company can get to it. * * * We are all very well satisfied to have you leave the note at the Bank of Naper." He then admitted that he wrote the letter, and that he received from Mr. Martindale the letter referred to therein. He was then asked: "Q. Now, did you see the note in the bank of Naper in December, 1904? A. According to that letter, I did." No doubt this witness believed what he testified to. He was testifying from recollection to matters that had taken place six or seven years previously. He had been led to fully believe by the strong representation of his codefendants that the transfer indorsement was not upon the note when he saw it six years before, and was made to understand that to establish that fact would win his case; and, being asked upon the witness stand only the question which called for an explicit answer "yes" or "no," he answered according to his understanding and belief, and without having testified that he had any certain knowledge in regard to it. These observations apply equally to the other defendants who so testified. Such testimony amounts to an expression of strong belief of a circumstance which would win his case, and cannot overthrow physical facts which amount to a substantial demonstration.

The judgment of the district court is reversed and the cause remanded.

REVERSED.

MORRISSEY, C. J., dissenting.

HAMER, J., not sitting.